DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Michelle Bassette, has appealed from an order of the Summit County Court of Common Pleas, Juvenile Division, terminating her parental rights to one of her minor children, M.B., and placing the child in the permanent custody of Summit County Children Services Board ("CSB"). This Court reverses.
 I. {¶ 2} Appellant is the mother of four children: a boy, aged 15; and three girls, aged 13, three, and two months, as of the time of the permanent custody hearing.[1] Only the permanent custody of the third child, M.B., born February 27, 2000, is at issue in this case. Appellant's parental rights to the other children have not been terminated.
 {¶ 3} M.B. and her 13-year-old sister were initially removed from appellant's home on January 8, 2001 pursuant to Juv.R. 6. During school that day, the 13-year-old told her school counselor that she was afraid to go home. The counselor contacted CSB and the agency contacted the police. Together they took the child to her home, with the intent of establishing a safety plan.
 {¶ 4} Appellant testified that she was not feeling well because of the flu and symptoms of fibromyalgia, had just put M.B. down for a nap, and was sleeping when her 13-year-old came into her bedroom and asked her to talk to some people. Appellant first thought that they were solicitors. Then when she saw the police, she thought her son might have gotten in trouble. When they explained the reason for the visit, appellant reacted angrily, saying "if she's that afraid of me and she is that unhappy here, then she needs to go with you[.]"[2] Later that same evening, the CSB worker consulted with a supervisor and went back with police to remove M.B. as well, believing that she would not be safe in the home at the time.
 {¶ 5} M.B. and her 13-year-old sister were placed in emergency temporary custody and the matter proceeded to adjudication, where a finding of dependency was entered. Appellant appealed that ruling and the judgment was affirmed by this Court. In re Bassette, Mar. 27, 2002, 9th Dist. No. 20751. On September 27, 2002, the parties agreed that the 13-year-old would be placed in the legal custody of her father, under protective supervision. The question of the permanent custody of M.B. proceeded to a hearing, which took place over five days from June 2003 through August 2003. The juvenile court granted CSB's motion, and appellant appealed that decision. This Court reversed the judgment because the trial court failed to make the requisite finding on the best interest of the child. See In re M.B., 9th Dist. No. 21760, 2004-Ohio-597, at ¶ 10. Upon remand, the trial court found that M.B. had been in the temporary custody of CSB for twelve or more months of a consecutive 22-month period, and also that it was in the child's best interest that CSB be granted permanent custody.
 {¶ 6} The matter of the custody of M.B.'s two older siblings proceeded separately, with the 15-year-old boy being placed in the legal custody of his father with protective supervision, and the 13-year-old girl, being placed in a planned permanent living arrangement ("PPLA"). In re M.B. and C.B., 9th Dist. No. 21812, 2004-Ohio-2666, at ¶ 3. The fourth child, born April 15, 2003, has remained in the custody of appellant since her birth and is not the subject of court action.
 {¶ 7} Appellant now appeals from the judgment terminating her parental rights to M.B. and raises two assignments of error.
 II. ASSIGNMENT OF ERROR I
"The trial court erred in finding that permanent custody was supported by clear and convincing evidence and the grant of permanent custody was against the manifest weight of the evidence."
 {¶ 8} Appellant asserts that the weight of the evidence does not support the finding that permanent custody was in the best interest of the child.
 {¶ 9} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent based on an analysis under R.C.2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 99. The trial court found that the first prong of the test was satisfied because M.B. had been in the temporary custody of CSB for at least 12 of the prior 22 months and appellant does not challenge that finding. Appellant challenges only the finding that it was in the best interest of the child to be placed in the permanent custody of CSB.
 {¶ 10} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[3]
"Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at 6. See, also, In rePalladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 11} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of he child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 12} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In reOzmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 13} Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
 {¶ 14} A review of the evidence presented at the permanent custody hearing reveals that CSB failed to establish by clear and convincing evidence that permanent custody was in the best interest of M.B.
 {¶ 15} The first best interest factor, the interaction and interrelationship of M.B., is "highly significant" and "focuses on a critical component of the permanent custody test: whether there is a family relationship that should be preserved." In reSmith, (Jan. 2, 2002), 9th Dist. No. 20711; In re C.M., 9th Dist. No. 21372, 2003-Ohio-5040, at ¶ 11. Much of the evidence presented at the permanent custody hearing relates to this factor.
 {¶ 16} The case worker and the guardian ad litem both presented unusually positive testimony regarding the conduct of visitations. Donald Badjun, the CSB caseworker assigned to the case, testified that appellant's visitations with M.B. had been consistent and had been increased from one hour per week to two hours per week. Badjun testified that appellant planned age-appropriate activities in which the child became engaged and participated. M.B. would move from one activity to the next and not become bored. Badjun stated that appellant was able to set appropriate boundaries and that the child was not uncomfortable at all. She was able to laugh and giggle with her mother and accept an embrace.
 {¶ 17} Badjun admitted that visitations seemed to go well. Indeed, he stated that he had no concerns based on his observations of appellant with her child; that appellant demonstrated appropriate parenting skills; and that he had not observed any inappropriate parenting of M.B. by appellant. Of further significance is the fact that he had no knowledge of appellant becoming violent, raising her voice, or yelling at her children during visitation over the last two and one-half years. He indicated that he was also able to observe appellant with her infant daughter during visitations with M.B., and noted that there was no court involvement with the infant. Badjun also confirmed that appellant is currently having unsupervised visits with her 13-year-old daughter.
 {¶ 18} In regard to appellant's living situation, Badjun stated that appellant's apartment was clean, had ample furniture, and that he had no concerns with appellant's financial status. He also stated that appellant responded to messages promptly.
 {¶ 19} Bonnie McLean, the guardian ad litem, testified similarly that appellant was very inventive, planned her visits with M.B., brought snacks, knows how to organize time, and can keep the child busy. McLean stated that she never witnessed appellant lose her temper with the child, act strangely, be disinterested, or do anything inappropriate with M.B. In fact, McLean said appellant was "engaged and active" with M.B. during visits.
 {¶ 20} Despite these very positive reports of the relationship between appellant and M.B., both the caseworker and the guardian ad litem testified that they believed it was in the best interest of the child to be placed in the permanent custody of CSB. The caseworker said she believes that appellant's ability to have insight with respect to parenting responsibility "comes and goes." Presently, she is appropriate and her parenting is adequate, but letting M.B. return home "would be a risk." Badjun believes that appellant has made insufficient progress on mental health issues and does not believe appellant has the capacity to subordinate her own wants and needs to those of the child. Similarly, the guardian ad litem thought that appellant continues to blame others for her problems, puts herself ahead of her children, and cannot provide emotional stability to M.B.
 {¶ 21} Both witnesses relied in part on the testimony of the psychologist, Dr. Ann S. Hickin, who evaluated appellant in the fall of 2002 and reported severe psychological problems in two areas: (1) appellant was self-indulgent, selfcentered, dramatic, and needed attention which may result in an inability to offer empathy or sympathy to others and interfere with intimate relationships; (2) appellant had a history of alcohol use, and related criminal behavior (two DUI convictions in 1997) which may result in hostile and angry feelings. Hickin also stated that appellant was not using alcohol or illegal substances at the time, but that "if a person has done this once in their life, it continues."
 {¶ 22} The record does not contain any evidence of continuing problems with substance abuse by appellant, however. Appellant's case plan included a substance abuse component with which she fully complied. She participated in a substance abuse assessment, was not required to participate in related counseling, and complied with random urine screens for over a year until she was told that she could stop. Appellant testified that she does not drink alcohol because of the medications she takes. Appellant's pain management doctor testified that his office closely monitors patients through drug screens because their medications are subject to abuse and to determine body absorption rates, but testified that appellant has been compliant and has not posed a problem in this regard. There is no basis to conclude that alcohol or drug abuse is a current issue for appellant,
 {¶ 23} Hickin said her chief concern was appellant's use of coping mechanisms of suppression, rationalization, and projection of blame onto others. At the time of her evaluation, Hickin did not believe appellant could adequately parent M.B. on a full-time basis. However, she also stated that appellant was very intelligent and could learn to modify these personality traits and adequately parent a child. Hickin also allowed that her report might have been different if she had received information from appellant's other providers.
 {¶ 24} In that regard, testimony from appellant's other providers should be considered. Appellant's most current counselor, Greg Markovich, testified that appellant had been very cooperative in counseling, had made "very significant progress," accepted responsibility for the actions that brought CSB into the family, and demonstrated "[q]uite a bit" of insight. He explained that appellant is in recovery from serious mental health issues and has expressed a willingness to continue in counseling. Markovich stated clearly that appellant's diagnosis does not prohibit her from being able to parent.
 {¶ 25} Dr. Bressi, a rheumatologist and appellant's pain management doctor, testified that appellant was not diagnosed with fibromyalgia until April 2001, after M.B. was removed from appellant's home. He also testified that many people with appellant's level of fibromyalgia — or much worse — have children of all ages and do very well. Most function despite severe pain problems. They may occasionally be bedridden for a day or so, but, for the most part do very well.
 {¶ 26} Jeff Robson, appellant's clinical counselor, testified that appellant's mental health issues were in remission and that appellant did not need services for chronic mental or emotional illness. Robson stated that appellant had been compliant with his recommendations, had demonstrated insight and accepted responsibility for her behavior when her children were removed. Robson never felt that appellant would be a danger to her children and did not observe anything that would prevent her from parenting her children. He saw nothing unusual about the way she dealt with day-to-day issues. He said that people with her type of disorders can have some occasional dysfunction, but can function, remain stable and can absolutely parent children.
 {¶ 27} Therefore, in weighing the recommendations of the caseworker and guardian ad litem, it appears that they viewed Dr. Hickin's testimony as more prohibitive than it actually was, and, even so, she admittedly lacked input from other providers who concluded that appellant could function, remain stable, and parent her children. Moreover, given the very positive reports by both witnesses on appellant's visitations with M.B., there is little evidence that the concerns expressed by the caseworker and guardian ad litem actually had an impact on appellant's parenting and on the child.
 {¶ 28} The single area of potential impact and concern is the fact that, at the time of the permanent custody hearing, appellant had not had any visits with M.B. for several weeks. At that point in time, appellant had recently delivered a child by Caesarean section, contracted a related infection, was providing care for her two-month-old child, subsequently broke a toe and was on crutches. CSB did bring M.B. to the home for a few visits, but refused to do so after appellant recovered from her infection. Appellant asked CSB to continue bringing M.B. to her home for visitation because she had difficulty using public transportation and transporting the newborn while she was on crutches. CSB refused and insisted that appellant was able to travel to the visitation center.
 {¶ 29} The fact that appellant had otherwise been very consistent in attending visitations and also that the visits had been going very well lead this Court to conclude that this is a problem that could — and probably should — have been worked out by the parties. It was likely a temporary problem that was created by the personalities[4] involved and does not pose a prohibitive problem for the longterm.
 {¶ 30} In addition to expert witnesses, Appellant presented a neighbor, Renee Long, as a witness. Long spoke of the positive interaction of appellant with M.B., of M.B. giving hugs to appellant, and of the activities that appellant had planned for visits. Long had also been present when each of the older two children visited appellant. Long stated that she never saw appellant get short-tempered with the children or yell at them. She believes that appellant is responsible and denies that appellant is self-centered or puts her needs before the needs of the children. She drove appellant to the visitation center for a visit, and saw M.B. run up to her, climb into her lap and hug her.
 {¶ 31} Appellant also testified on her own behalf. She stated that she understands that her child was removed because of the way she reacted when CSB came to her home and they did not believe the child was safe with her. She agrees that there were problems that needed to be addressed and that she will continue to address them through counseling. She also stated that counseling has helped her and she has applied what she has learned. She believes she is capable of parenting M.B.
 {¶ 32} Appellant stated she always brings a basket to visitations, filled with toys, coloring books, crayons, Play-Doh, a tape player for music, cassette tapes, and an activity book for cutting, pasting, and using stickers. Appellant asked for the visits to be moved to 10:00 in the morning so that they would not interfere with M.B.'s naptime. Appellant enjoys spending time with her daughter and "can't get enough of her." She enjoys watching her play and teaching her new things.
 {¶ 33} Appellant plans to become involved with a program for parents of teen-agers and has already signed up for several family service seminars. She also Court of Appeals of Ohio, Ninth Judicial District reads a great deal about child care on her own. She believes she is well-versed in what is available in counseling in the area and has learned to ask the right questions. She claims she knows how to handle her situation, more so than a parent who has not been through these things. She wants to raise her children to be good citizens and good people, knowing the difference between right and wrong.
 {¶ 34} In addition to M.B.'s relationship to appellant, M.B. also has a relationship with her three siblings. There is a special bond between siblings that merits protection when possible. Appellant's oldest child, her son, occasionally visits her home. Appellant has put a trundle bed on layaway because her 13-yearold daughter wants to share a room with M.B. Her Christmas present to M.B. would be to decorate the room. In addition, appellant's youngest child has remained in her care, demonstrating some parenting ability on appellant's part. M.B., therefore, has a relationship with all her siblings.
 {¶ 35} For most of the time M.B. has been in the custody of CSB, M.B. was placed with a great aunt and uncle. The child is reportedly close to her caretakers. They have provided her with security and stability, and are dedicated to her best interest.
 {¶ 36} While M.B.'s caretakers have apparently declared their willingness to include appellant in M.B.'s life if permanent custody is granted and they are able to adopt the child, there is no guarantee that the caretakers, at ages 56 and 72, will be permitted to adopt the child. In any case, the termination of appellant's parental rights must be considered to be a permanent severance of those rights and relationships.
 {¶ 37} Based on these facts, the relationships and interrelationships of M.B. do not weigh in favor of the termination of parental rights.
 {¶ 38} The second best interest factor requires consideration of the wishes of the child. Because M.B. was only three years old at the time of the hearing, the trial court did not interview her, but the guardian ad litem spoke on her behalf. The guardian ad litem testified that permanent custody was in the best interest of M.B. because appellant puts herself ahead of her children and cannot provide emotional stability. However, in evaluating appellant's progress, McLean said she thought it most important to evaluate how appellant's relationship with her 13year-old daughter was developing because that would be a predictor of how appellant's relationship with M.B. might also develop. It is significant, then, that the 13-year-old was having unsupervised visits with appellant, and that, according to Mclean, appellant's 13-year-old daughter stated that she wants to return to live with her mother and has wanted this for "quite a while." McLean also testified that the 13-year-old's relationship with her mother has improved over the last two and three-quarters years. By the guardian ad litem's own reasoning, therefore, it seems that appellant has demonstrated progress in her ability to relate to others, and especially to her children.
 {¶ 39} The third best interest factor is the custodial history of M.B.M.B. was removed from her mother's home at approximately ten months of age and remained in agency custody for two and one-half years, as of the time of the permanent custody hearing.
 {¶ 40} As this Court has previously indicated, "the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on this child." In re Smith (Jan. 2, 2002), 9th Dist. No. 20711. Part of the reason for such a lengthy delay in this case, is that appellant exercised her right to appeal from the adjudication rendered by the juvenile court and successfully appealed the judgment of the juvenile court terminating her parental rights. In re M.B., 9th Dist. No. 21760, 2004-Ohio-597. The fact that appellant was not willing to surrender her fundamental right to the care and custody of her child or her civil right to invoke judicial process cannot weigh against her.[5]
 {¶ 41} The final factor that the trial court must consider is M.B.'s need for a legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to CSB. In this case, the evidence established that the caretakers of M.B., considered by CSB to be a potential adoptive placement, would be willing to accept legal custody of the child. If a legally secure permanent placement could be accomplished without terminating parental rights, the agency should have explored it and the trial court should have considered this less drastic alternative to permanently severing a family relationship. See R.C. 2151.414(D)(4).
 {¶ 42} The termination of parental rights is an alternative of last resort and the burden of proving by clear and convincing evidence that the termination of appellant's parental rights was warranted under R.C. 2151.414(D) falls squarely upon CSB. Appellant has no burden to prove that her parental rights should not be terminated. Based upon the evidence before the trial court on each of the best interest factors, this Court concludes that CSB did not meet its burden in this case. The first assignment of error is sustained.
 ASSIGNMENT OF ERROR II
"The trial court erred in denying appellant's motion to dismiss the case based (SIC)."
 {¶ 43} Appellant argues that the trial court erred in failing to dismiss the case based upon a claimed failure to conduct a timely dispositional hearing.
 {¶ 44} In her supporting argument, appellant points to the fact that M.B. was removed from her home on January 8, 2001, and the permanent custody hearing was not commenced until June 19, 2003. Appellant filed a motion to dismiss on March 22, 2004. She cites R.C. 2151.353(F) and R.C. 2151.415(D) as establishing two years as the maximum period that CSB may have temporary custody of a child.
 {¶ 45} R.C. 2151.353(F) provides that temporary custody orders issued pursuant to that statute shall generally terminate one year after the earlier of the date the complaint was filed or the child was first placed in shelter care. R.C. 2151.415(D) provides that the juvenile court may grant up to two extensions of temporary custody for a period of up to six months each.
 {¶ 46} A portion of the delay in this case arose from the fact that an appeal was taken from the adjudication. In reBassette (Mar. 27, 2002), 9th Dist. No. 20751. In addition, a successful appeal was taken by appellant from a previous award of permanent custody. In re M.B., 9th Dist. No. 21760, 2004-Ohio-597.
 {¶ 47} Nonetheless, the Ohio Supreme Court has indicated that a juvenile court may exercise continuing jurisdiction when the parents have not remedied the underlying conditions that led to the granting of temporary custody. In re Bowers, 10th Dist. Nos. 02AP-347 and 02AP-379, 2002-Ohio-5084, at ¶ 27, citing Inre Young Children (1996), 76 Ohio St.3d 632. See, also, In reM.Z., 8th Dist. No. 80799, 2002-Ohio-6634, at ¶ 27-¶ 30. "The passing of the statutory time period (`sunset date') pursuant to R.C. 2151.353(F) does not divest juvenile courts of jurisdiction to enter dispositional orders." Young Children,76 Ohio St.3d 632, at syllabus.
 {¶ 48} R.C. 2151.353(E)(1) provides that, as to abused, neglected or dependent children, the juvenile court retains jurisdiction over those children to ensure their safety and proper treatment until they become adults. In re Cross,96 Ohio St.3d 328, 2002-Ohio-4183, at ¶ 10.
 {¶ 49} Accordingly, appellant's second assignment of error is overruled.
 III. {¶ 50} Appellant's first assignment of error is sustained. Appellant's second assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed.
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellee.
Exceptions.
Slaby, J., Batchelder, J., concur.
[1] The father of M.B., Franklin Smith, participated in the hearing below and sought custody at that time, but has not appealed from the judgment of the juvenile court and is not a party to this appeal.
[2] During her testimony, appellant explained her reaction in terms of recent events. Four weeks earlier, the 13-year-old had run away from home because appellant would not let her take care of the baby. The evening before, they had argued about her wanting to live with her father. Appellant told her she had to stay until her probation was up and then she could live with him. Appellant believed that, by complaining to her counselor, her daughter may have been attempting to get out of a juvenile court hearing set for the next day.
Appellant stated that she was taken by surprise by the appearance of the CSB worker and the police. She claims she now understands that she should have remained calm and explained the situation to them.
[3] The factor set forth in R.C. 2151.14(D)(5) is not relevant in this case.
[4] While personality conflicts may not always appear through a paper record, in this case the trial court commented upon an observed inability of the caseworker and appellant to get along.
[5] This Court notes with some concern the fact that the guardian ad litem asked appellant why she was appealing and putting her children through this.