[Cite as *In re L.L.*, 2022-Ohio-4492.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: L.L.

C.A. No.     30266

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN19-11-979

DECISION AND JOURNAL ENTRY

Dated: December 14, 2022

CARR, Presiding Judge.

{¶1}     Appellant, N.J. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that adopted a magistrate's decision and placed his child in the legal custody of a maternal uncle ("Uncle"). This Court affirms.

I.

{¶2}     Father is the biological father of L.L., born July 23, 2016. The child's mother ("Mother") did not appeal the trial court's judgment.

{¶3}     On November 26, 2019, Summit County Children Services Board ("CSB") filed a complaint, alleging that L.L. was an abused, neglected, and dependent child. A few days earlier, L.L. was removed from Mother's custody pursuant to Juv.R. 6, along with her two older half-siblings, who are not Father's children and are not parties to this appeal. Ten days later, the agency filed an amended complaint, which added more recent allegations about Mother's parenting

behavior, including her admission that, while she was intoxicated, she had left then three-year-old L.L. home alone.

{¶4} L.L. was later adjudicated abused, neglected, and dependent and was placed in the temporary custody of CSB. L.L. was initially placed in the home of Uncle, along with her two older half-siblings.

{¶5} The original case plan was adopted by the trial court. The case plan required Father, who had not been actively involved in L.L.'s life, to contact CSB and inform the agency about whether he intended to assume a parenting role in L.L.'s life. Throughout most of this case, Father lived in Allegheny County, Pennsylvania. He first contacted CSB about L.L. during June 2020 but did not contact the agency again until he came to a review hearing on August 4, 2020. He spoke to the caseworker and expressed interest in custody of L.L.

{¶6} The case plan was amended to add reunification services for Father, including that he would be permitted to visit L.L. Because he had a history of domestic violence, Father was also required to complete an anger management program, which he did. The case plan further required CSB to contact the children services agency in Allegheny County through the Interstate Compact for the Placement of Children ("ICPC") to investigate Father and his home to determine whether Father would be a suitable placement. At that time, Father lived in the home of K.W., with whom he was involved in a romantic relationship. K.W. owned the home and had been living there with her own children for an extended period.

{¶7} Father, the home, and those residing there (K.W. and her children) were later approved through the ICPC investigation. L.L. was placed in that home on April 8, 2021. Father was required to stay in contact with the Pennsylvania caseworker ("ICPC caseworker"), allow her to regularly check on L.L. via home visits, and keep the ICPC caseworker apprised of any changes

in L.L.'s circumstances. The case plan was again amended to reflect that L.L. had been placed with Father in Pennsylvania. Amendments included that "[L.L.] will need to reside with [Father] for six months while being monitored by a worker from Pennsylvania before [CSB] can ask for legal custody to be granted to [Father] with the approval of the state of Pennsylvania."

{¶8} The ICPC caseworker regularly visited K.W.'s home in which L.L. was living with Father and observed that L.L. was doing well there. She further observed, however, that K.W. was acting as the primary caregiver of L.L. and her own children. During early September 2021, K.W. and Father ended their relationship and, without informing the ICPC caseworker, Father and L.L. moved out of K.W.'s home. Because the ICPC caseworker was scheduled to visit the home again on September 15, 2021, K.W. called her shortly beforehand to cancel the home visit. The ICPC caseworker then learned for the first time, more than a week after they moved, that Father and L.L. were no longer living in K.W.'s home. K.W. informed her that she believed Father and L.L. were living nearby but she did not know the location.

{¶9} The ICPC caseworker immediately sent Father a text message, but he did not respond. She later reached him via a telephone call, but he did not disclose where he and L.L. were living. Father told her that they had been staying with a woman who did not want the caseworker to come to her home, so they would move elsewhere. Father agreed to meet the ICPC caseworker at a hotel, but the caseworker did not believe that Father and L.L. were living there. The caseworker eventually received information that Father and L.L. had stayed in the homes of two different women, but she had not met either woman or had the opportunity to investigate them or their homes. Because of Father's lack of stable housing and his failure to cooperate with the ICPC caseworker, Pennsylvania revoked its ICPC approval of Father as a placement for L.L.

{¶10} Meanwhile, before Father and L.L. moved out of K.W.'s home, Father had not been cooperating with the caretakers of her older two half-siblings in Ohio to arrange sibling visits. On August 30, 2021, the trial court ordered Father to arrange for L.L. to have visits with her half-siblings at least one weekend a month. By that time, only one of L.L.'s half-siblings remained in the home of Uncle and the other had been placed with that child's father. On September 17, 2021, L.L. returned to Summit County, apparently for court-ordered visitation with her half-siblings.[1]

{¶11} While L.L. was in Ohio, because Pennsylvania had revoked its ICPC approval, the child was again placed in Uncle's home. Based on Father's erratic behavior observed by the CSB caseworker, and information received from the ICPC caseworker, CSB also became concerned about Father's mental health. Father had been evasive and dishonest with them, had expressed increasingly paranoid thoughts, and, according to the CSB caseworker, his statements were "nonsensical at times." The paternal grandmother also contacted the CSB caseworker to express concerns about Father's unstable mental health.

{¶12} Because L.L. had returned to Uncle's home and was again doing well there, and this case had been pending for nearly two years, CSB moved to place L.L. in the legal custody of Uncle. Father alternatively moved for L.L. to be placed in his legal custody. Following a hearing before a magistrate, L.L. was placed in the legal custody of Uncle. The trial court adopted the magistrate's decision and entered an independent judgment placing L.L. in the legal custody of Uncle. Father did not file objections to the magistrate's decision. Instead, after his

---

[1] The specific details of L.L.'s trip to Ohio, including who transported her, are not set forth in the record.

trial counsel withdrew and he was appointed appellate counsel, he filed an appeal of the trial court's judgment. His three assignments of error will be addressed together to facilitate review.

II.

### ASSIGNMENT OF ERROR I

[FATHER] WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, AS MADE APPLICABLE TO THE STATES BY AND THROUGH THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT GRANTED LEGAL CUSTODY TO MATERNAL UNCLE WHEN THE AGENCY DID NOT PROVIDE REASONABLE REUNIFICATION EFFORTS.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AND COMMITTED PLAIN ERROR WHEN IT GRANTED LEGAL CUSTODY OF THE MINOR CHILD TO MATERNAL UNCLE AND DENIED FATHER'S MOTION FOR LEGAL CUSTODY.

{¶13} Father challenges the trial court's legal custody decision as not being supported by the evidence and because he asserts that CSB did not provide him with reasonable reunification efforts. Father does not dispute that he did not file objections to the magistrate's decision.

{¶14} To avoid forfeiture of these arguments, Father was required to comply with Juv.R. 40(D). Juv.R. 40(D)(3)(b)(iv) provides, in relevant part, that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." Because Father did not file objections, he concedes that he did not preserve the issues raised in his second and third assignments of error for appellate review and has confined his argument to a plain error standard of review. His first assignment of error is that his trial counsel was ineffective for failing to file timely objections to the magistrate's decision.

**{¶15}** Under either standard of review, Father has the burden to demonstrate substantial error and prejudice. To establish a claim of ineffective assistance of counsel, Father must demonstrate that his trial counsel's performance was deficient, and that the deficient performance prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, he must show that there is a reasonable probability that, but for trial errors, the result of the proceeding would have been different. *Id*. at 694.

> The standard of review for plain error is similar to the standard for reviewing a claim of ineffective assistance of counsel, although plain error requires more certain proof of prejudice to the appellant. While ineffectiveness requires proof of a *reasonable probability* that the trial result would have been different but for the error, plain error under the criminal standard requires proof that the trial result *clearly* would have been otherwise. *State v. Murphy,* 91 Ohio St.3d 516, 559 (2001) (Cook, J, concurring). The civil plain error standard requires the demonstration of an even greater level of error, as it must be one that rises to the level of challenging the legitimacy of the underlying judicial process itself. *Goldfuss v. Davidson,* 79 Ohio St.3d 116 (1997), syllabus. This Court has not determined which is the appropriate plain error standard to apply in cases involving [] parental rights and it need not do so now. *See In re D.S.,* 9th Dist. Summit No. 24619, 2009-Ohio-3167, ¶ 10.

*In re J.S.*, 9th Dist. Summit Nos. 28342 and 28344, 2017-Ohio-75, ¶ 9.

**{¶16}** This Court will review each of Father's alleged errors to determine whether he has demonstrated error that rose to the high level required under either the ineffective assistance standard or the plain error standard of review. First, Father asserts that his trial counsel was ineffective for failing to file objections to the magistrate's decision. Although he did not specify what objections trial counsel should have raised, this Court will presume that he is referring to the arguments raised in his remaining assignments of error. Father's second assignment of error is that CSB did not make reasonable efforts to place L.L. with Father or prevent her removal from his custody. His third assignment of error is that the trial court erred in concluding that legal

custody to Uncle, rather than Father, was in the best interest of L.L. We will address each argument in turn.

**Reasonable reunification efforts**

{¶17} Father first points to the trial court's finding that CSB made reasonable efforts to reunify L.L. with Father, attempting to demonstrate plain error or that trial counsel was ineffective for failing to challenge the reasonable efforts finding. No one disputes that CSB had the obligation to make reasonable reunification efforts in this case. This Court has explained:

> The law imbues parents with the substantial right to raise their children and concomitantly entitles them to all legally permissible procedural and substantive protections. *In re C.S.*, 9th Dist. Summit Nos. 29927, 29929, and 29938, 2021-Ohio-3182, ¶ 25. These include the child welfare agency's obligation to make reasonable efforts to reunify children with one or both parents. *Id.* The case plan is the tool used by the agency to facilitate family reunification efforts. *In re H.S.*, 9th Dist. Summit Nos. 28944 and 28948, 2018-Ohio-3360, ¶ 18. In fact, the overriding purpose of the case plan is to allow the agency to assist the parents in remedying the conditions underlying a child's removal so that the child can be returned safely to one or both parents' custody. *In re S.R.*, 9th Dist. Summit No. 27209, 2014-Ohio-2749, ¶ 45.

*In re K.J.*, 9th Dist. Summit No. 29915, 2021-Ohio-4413, ¶ 18.

{¶18} In this case, the record reveals that CSB provided Father with reasonable reunification efforts throughout this case, but that Father's own conduct was the obstacle to him receiving legal custody of L.L. The original case plan required Father to contact CSB if he wanted to assume a parenting role in the life of L.L. The case plan was adopted as an order of the court on March 4, 2020. Five months later, Father spoke to the CSB caseworker and expressed interest in custody of L.L. CSB promptly amended the case plan to add reunification services for Father and Father participated in those services. After a period of extended visits with L.L. and approval for ICPC placement in Pennsylvania, CSB facilitated the placement of L.L. with Father in the Pennsylvania home where he resided with K.W. and her children.

{¶19} Under the conditions of Father's ICPC placement and the amended case plan, Father was required to maintain a stable home with L.L. for at least six months and keep the ICPC caseworker apprised of any changes in L.L.'s living circumstances. Father failed to comply with either of those requirements, however. Approximately five months after L.L. was placed with Father, without notifying the ICPC caseworker, Father and L.L. moved out of K.W.'s home.

{¶20} More than one week later, the ICPC caseworker discovered that Father had relocated with L.L. only because K.W. called her to cancel an upcoming scheduled home visit. When the ICPC caseworker was able to reach Father, he failed to inform her where he and L.L. were staying. He did not secure a stable home that could be inspected and approved for placement of the child. L.L. was ultimately returned to Uncle's home, not because of a lack of reunification efforts in this case, but because Father failed to comply with the requirements of the case plan and ICPC placement.

{¶21} Even by the time of the hearing in January 2022, Father had not demonstrated that he had a stable home. Several witnesses testified that they did not know where Father was living, or even if he was in Ohio or Pennsylvania. Father had told people throughout this case that he planned to move to Florida. Father testified at the hearing that he was staying with a friend in Pennsylvania, but he still planned to move to Florida.

{¶22} A few weeks before the hearing, Father told the guardian ad litem that he was living with the paternal grandmother and arranged for a meeting at the grandmother's home. The guardian ad litem believed that he was speaking to Father where he was residing. The grandmother later reached out to the CSB caseworker, however, to inform her that Father was not living in her home because he was not emotionally stable, and she did not want him living there. The grandmother did not know where Father was living at that time. The grandmother had a lengthy

conversation with the caseworker, during which she expressed concerns about Father's paranoia and mental instability.

**{¶23}** On appeal, Father asserts that CSB did not provide him with reasonable reunification efforts because, after becoming concerned about his mental health, it did not amend the case plan to add mental health services for Father. When concerns first arose about Father's mental health, however, Pennsylvania had revoked its ICPC approval because of Father's lack of housing and failure to cooperate with the ICPC caseworker, and L.L. was returned to Uncle's home.

**{¶24}** In addition to Father's failure to cooperate with the children services agencies in Pennsylvania and Summit County, CSB was running out of time to find L.L. a permanent home. By that time, this case had been pending for nearly two years and the trial court lacked authority to grant another extension of temporary custody to allow Father to work on mental health and other reunification services. *See* R.C. 2151.353(G); R.C. 2151.415(D)(4). Because L.L. was again doing well in Uncle's home, CSB decided to move for legal custody to Uncle.

### Legal custody to Uncle

**{¶25}** Next, Father challenges the trial court's decision to award legal custody of L.L. to Uncle. An award of legal custody must be supported by a preponderance of the evidence. *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7. "Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value." (Internal quotations omitted.) *Id.*

**{¶26}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder

of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶27} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H*., 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B*., 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P*., 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G*., 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A*., 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, and the child's need for permanence. R.C. 2151.414(D)(1)(a)-(e)[2]; *see also In re B.C*., 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

{¶28} The juvenile court may also consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A*., 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While many factors overlap with those set forth in R.C. 2151.414(D)(1), a separate factor relevant here is the

---

[2] R.C. 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case, but none of those factors are relevant here.

proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(f).

{¶29} Father's interaction with L.L. began approximately five months after the case plan was adopted. Their visitation went well and expanded until L.L. was placed with Father in K.W.'s home for approximately five months. Their interaction was positive, as observed by the ICPC caseworker, but K.W. owned the stable home and had assumed most of the parenting duties. L.L. returned to Ohio and was placed with Uncle during late September 2021. From that time until the time of the hearing four months later, Father did not come to visit L.L. Father told the caseworker that he had not visited because it was too painful to see L.L. living with Uncle.

{¶30} Uncle's interaction with L.L. throughout this case had been positive. L.L. lived with Uncle for more than a year before the child was placed with Father in Pennsylvania. After L.L. returned to Uncle's home, she lived there for another four months before the hearing. One of the child's half-siblings also lived in Uncle's home and Uncle had ensured that L.L. was able to see her other half-sibling, who lived with that child's father.

{¶31} Because L.L. was only five years old at the time of the hearing, the guardian ad litem spoke on her behalf. He opined that legal custody to Uncle was in the child's best interest because he had provided her with a stable home for well over a year during this case and the child was doing well there. The guardian ad litem expressed concerns about Father receiving legal custody, including that he had been dishonest about where he was living and was increasingly demonstrating signs of mental instability. The guardian ad litem testified that, when he went to visit Father in the grandmother's home, Father became so agitated over simple questions that the grandmother had to intervene to calm him down.

**{¶32}** This case had been pending for over two years by the time of the final dispositional hearing. L.L. had moved back and forth between temporary placements and needed a legally secure permanent home. Uncle was prepared to provide the child with a stable, permanent home, while Father had yet to demonstrate to CSB that he had a suitable home.

**{¶33}** Finally, the trial court heard evidence that Uncle was willing to facilitate visits between Father and L.L., as well as between L.L. and her half-sibling, as he had done throughout this case. Father, on the other hand, had not allowed L.L. to attend visits with her half-siblings until the court compelled him to do so.

**{¶34}** Given the evidence before the trial court, Father has failed to demonstrate any error in the trial court's reasonable efforts finding or its legal custody decision, much less the level of error and prejudice required to demonstrate plain error or ineffective assistance of trial counsel. Father's assignments of error are overruled.

III.

**{¶35}** Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

CALLAHAN, J.
SUTTON, J.
CONCUR.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorneym, for Appellee.

VICTOR O. CHUKWUDELUNZU, Attorney at Law, for Appellee.

NEIL P. AGARWAL, Guardian ad Litem.