[Cite as *In re T.S.*, 2025-Ohio-2140.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: T.S.
     L.S.

C.A. Nos.     31297
                 31298


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 22 02 0143
                DN 22 02 0144

DECISION AND JOURNAL ENTRY

Dated: June 18, 2025

---

CARR, Judge.

**{¶1}** Appellant, S.S. ("Mother") appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her two minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court reverses and remands.

I.

**{¶2}** Mother is the biological mother of T.S., born April 7, 2010; and L.S., born November 14, 2018. The children's father did not appeal from the permanent custody judgment and is no longer involved in a romantic relationship with Mother. Mother has an older child who is not a party to this appeal.

**{¶3}** Mother has a prior history with CSB, including a prior case in which the juvenile court removed T.S. and L.S. from their parents' custody in February 2020. The children were

adjudicated dependent based on the parents' ongoing problems with substance abuse, mental health diagnoses, and domestic violence perpetrated by Father against Mother. The parents also lacked stable income and appropriate housing and T.S. suffered from behavioral problems. The parents complied with the reunification requirements of the case plan and the juvenile court ultimately returned the children to their legal custody. The juvenile court closed that case in July 2021.

{¶4} Seven months later, Akron Police removed T.S. and L.S. from their parents' custody pursuant to Juv.R. 6 after another incident of domestic violence perpetrated by Father against Mother in the presence of the children. When police responded to the home, they arrested Father, who was alleged to have caused visible injuries to Mother. They also observed the home to be cluttered and filthy; the children had poor hygiene; and there was inadequate food in the home.

{¶5} The following day, CSB filed complaints to allege that T.S. and L.S. were abused, neglected, and dependent children. The complaints alleged the same problems as in the prior case involving these children: the parents were abusing illegal drugs; Father had perpetrated domestic violence against Mother; T.S. was exhibiting disruptive behavioral problems; and the parents otherwise lacked the ability to provide a safe and stable home for the children. At that time, Father had several prior felony domestic violence convictions and was on community control for the most recent offence. Father was charged with another offense of felony domestic violence, child endangering, violation of a protection order, and a community control violation.

{¶6} The children were initially placed with the maternal grandparents but were removed from that home one month later because CSB received a report that the grandparents were using

drugs, and they both tested positive for methamphetamine. The children were later placed in separate foster homes because of the behavioral problems of T.S.

{¶7} The parents later agreed to waive their rights to adjudicatory and dispositional hearings. The trial court adjudicated the children abused (endangered), neglected, and dependent, as set forth in an amended complaint; placed them in the temporary custody of CSB; and adopted the case plan as an order of the court. During the first year of the case, neither parent made significant progress on the reunification goals of the case plan.

{¶8} CSB initially moved for permanent custody during December 2022, but withdrew that motion several months later because Father had been making progress on the case plan. CSB alternatively requested, and the trial court granted, a six-month extension of temporary custody. Unfortunately, Father's case plan progress did not result in him being a viable placement for the children, in part because he never acquired stable housing. CSB had explored placement of the children with relatives in Texas, but those relatives did not ultimately pursue custody of the children. Throughout this case, T.S. and L.S. remained placed in separate homes, as neither of their respective foster families was willing to care for both children.

{¶9} On February 1, 2024, CSB again moved for permanent custody. Although Mother had tested positive for methamphetamine during most of this case, by February 15, 2024, Mother had stopped associating with her drug using friends in Akron, and demonstrated through regular drug testing that she was abstaining from using any illegal drugs. During early March, Mother moved to West Virginia to live with two aunts, who offered a strong family support system and encouraged Mother to work on the reunification requirements of the case plan. Consequently, Mother alternatively requested that the children be placed in her legal custody or in the legal

custody of one of her aunts ("Aunt J."). T.S., through counsel, filed a brief in support of Mother's motion for legal custody.

{¶10} Throughout the remainder of the case, Mother demonstrated through regular drug testing that she had abstained from using methamphetamine or other illegal drugs. Mother also complied with other requirements of the case plan by engaging in regular mental health counseling and psychiatric medication management, and she had secured safe and stable housing and a strong family support system in the home of her aunts. CSB and the guardian ad litem had approved the aunts' home for placement.

{¶11} Because Mother and the aunts lived in West Virginia, however, it was necessary for their home to be approved for placement by the appropriate agency in that state through the Interstate Compact for the Placement of Children ("ICPC"). *See* R.C. 5103.20, Article III(A)(1) and Article VI(A). Although this case was more than two years old and CSB had moved for permanent custody, less than two months before the date scheduled for the final hearing, CSB sought an order from the juvenile court for a "priority placement" of the children with Mother and the aunts in West Virginia under Regulation No. 7 of the ICPC, which would require West Virginia to complete the home assessment within twenty business days of receiving the request and information from Ohio.

{¶12} Although the complete paperwork that CSB submitted with the ICPC request is not included in the record, CSB's motion to the juvenile court for the priority ICPC placement explained that the agency had completed all necessary paperwork for an expedited assessment and was prepared to send that information to the appropriate West Virginia state office. The agency's motion to the trial court also emphasized that Mother had been working on her case plan and had made progress on the reunification requirements. CSB also explained that it believed that the aunts

and their home were appropriate, that they had substantial relationships with T.S. and L.S., and that placement with Mother and the aunts would allow the siblings to be placed together.

{¶13} On May 28, 2024, the trial court issued an order for ICPC priority placement of the children in the West Virginia home of Mother and the aunts because the situation satisfied the explicit requirements of ICPC Regulation No. 7. *See* ICPC Regulation No. 7(5). It explicitly found that the children qualified for priority placement because they were part of a "sibling group" that has a strong bond with Mother and that they had a "substantial relationship" with their aunts for the majority of their lives. Despite the trial court's order, West Virginia was unable to complete the home study before the permanent custody hearing was scheduled to begin.

{¶14} Seven days before the hearing, the guardian ad litem and counsel for T.S. filed written motions to continue the permanent custody hearing because, through no fault of Mother, the children services agency in West Virginia had not yet conducted a home study of the home of Mother and the aunts. Specifically, the West Virginia caseworker assigned to do the home study had been unable to keep her scheduled appointment to inspect the home and interview the residents because her child had been hospitalized and her next available time was shortly before the hearing. The trial court denied the continuance and the permanent custody hearing was held on July 10 and 11, and October 4, 2024.

{¶15} On the second day of the hearing, Mother presented the testimony of the West Virginia caseworker who had been assigned to conduct the assessment of the home in which Mother lived with her aunts. As has been represented in the motion for continuance, she explained that she had not yet had the opportunity to interview Mother or the aunts or to inspect the inside of the home. She had viewed the outside of the home, which appeared to be appropriate.

{¶16}  On the third day of the hearing, held more than two months later, the same witness testified that she had completed the home study and interviews and had recommended approval of the home to the state agency, which would ultimately issue the final decision on the ICPC.  She further testified that the state of West Virginia had sent Mother a letter to inform her that she was not eligible for placement of the children because of her criminal background.  Although the witness was not involved in that communication and had not seen the specific results of Mother's background check, she explained that a criminal background typically precludes ICPC placement approval only for a non-parent, not the child's parent.  She testified that she had sent a letter to the state to clarify that Mother was the children's parent and that her criminal background should not disqualify her from placement.  At that time, the final results of the ICPC assessment were still pending with the state of West Virginia.

{¶17}  The evidence at the hearing was not disputed that Mother had made significant progress on the case plan; the children were closely bonded to Mother and each other and wanted to return to Mother's custody; the guardian ad litem supported returning the children to Mother or placing them with Aunt J., but wanted to wait for the ICPC results before making a recommendation; Aunt J. had been tentatively approved by the state of West Virginia for placement; Mother was willing to move out of the aunts' home if West Virginia did not ultimately approve her for placement; and CSB had found no one other than Mother and/or Aunt J. who was willing to provide a permanent home for both children.

{¶18}  At the conclusion of the hearing, the trial court questioned whether it had authority to wait for the ICPC results before issuing its final decision and granted the parties time to file briefs on the issue.  Mother and CSB submitted briefs, but did not address the trial court's specific question.  Instead, CSB asserted, as it does again on appeal, that the trial court could not place the

children in the West Virginia home with Mother and/or Aunt J. until six months after the ICPC approval. The only authority it cited, however, does not support that argument.

{¶19} Mother's brief to the trial court responded only to CSB's argument about the six-month placement requirement. She correctly asserted that CSB improperly relied on W.Va. Code §48-22-701, which pertains to adoption proceedings, and makes no mention of the ICPC. The ICPC is set forth in a separate Chapter of the West Virginia Code and includes no similar six-month placement restriction. *See* W.Va. Code §49-7-101. Moreover, CSB sought, and the trial court ordered, a priority placement under the ICPC, which presumably could have been accomplished within the time parameters of this case.

{¶20} As will be explained below, the trial court concluded that it lacked authority to wait for the ICPC results. Because the ICPC had not been approved, the trial court could not grant the legal custody motions of Aunt J. or Mother. The court issued a final judgment that terminated Mother's parental rights and placed T.S. and L.S. in the permanent custody of CSB. Mother appeals and raises four assignments of error, which will be addressed together because they are interrelated.

### ASSIGNMENT OF ERROR I

THE COURT ERRED TO THE MOTHER'S DETRIMENT WHEN IT FAILED TO MAKE ANY RECOUNTING OR FINDINGS OF FACT UPON WHICH TO BASE A LEGITIMATE JOURNAL ENTRY TERMINATING PARENTAL RIGHTS.

### ASSIGNMENT OF ERROR II

THE COURT ERRED TO THE MOTHER'S DETRIMENT WHEN IT STATED THAT IT FELT THAT THE CHILDREN'S PERMANENCY IS MORE IMPORTANT THAN STATUTORILY AND LAWFULLY REQUIRED PROCEDURES.

**ASSIGNMENT OF ERROR III**

THE COURT ERRED TO THE MOTHER'S DETRIMENT WHEN IT DENIED THE MOTIONS BY MOTHER AND THE CHILDREN'S GAL AND ATTORNEY TO CONTINUE THE HEARING UNTIL THE ICPC WAS COMPLETED.

**ASSIGNMENT OF ERROR IV**

THE COURT ERRED TO THE MOTHER'S DETRIMENT WHEN IT GRANTED PERMANENT CUSTODY BEFORE RECEIVING THE RESULTS OF THE ICPC FROM WEST VIRGINIA BECAUSE THERE WAS INSUFFICIENT EVIDENCE UPON WHICH TO BASE THE DECISION.

{¶21} Mother challenges the permanent custody decision on numerous grounds. Her arguments encompass an intertwined argument that the judgment was not supported by sufficient evidence, in part because the trial court did not wait for results of the West Virginia ICPC assessment of the potential placement of the children with Mother and/or Aunt J. This Court will focus its review on that issue. In reviewing Mother's arguments, this Court must emphasize that "termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). "Therefore, parents 'must be afforded every procedural and substantive protection the law allows.'" *Id.*

{¶22} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on

an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶23} The trial court found that the first prong of the permanent custody test was satisfied because T.S. and L.S. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period. Mother does not dispute that finding, which is supported by the record. At the time CSB filed the pending motion for permanent custody, these children had been in CSB's temporary custody for almost 22 months of the prior 22-month period.

{¶24} As the trial court explicitly emphasized in its judgment entry, "[t]he only issue remaining for the Court's determination" was whether permanent custody was in the best interest of the children. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, their custodial history, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)(7) through (11) are relevant in this case.

{¶25} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." (Internal quotations omitted.) *In re M.B.*, 2004-Ohio-5686, ¶ 10 (9th Dist.). Moreover, the trial court's finding that permanent custody is in the best interest of the children must be supported by clear and convincing evidence. R.C. 2151.414(B)(1). Clear and convincing evidence requires a level of proof that will "produce in the mind of the trier of facts a firm belief or conviction as to the facts

sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶26} Mother's fourth assignment of error is that the trial court's best interest finding is not supported by sufficient evidence because it lacked evidence about the West Virginia ICPC results. Upon review of the evidence pertaining to each of the statutory best interest factors in this case, this Court cannot conclude that the trial court's best interest finding was supported by the requisite level of proof.

{¶27} This Court will address each of the statutory best interest factors, beginning with the children's interaction with Mother. The trial court did not explicitly address this factor, except to make a positive finding that there is a bond between Mother and the children. This Court has repeatedly emphasized that this first best interest factor is "highly significant" because it focuses on "whether there is a family relationship that should be preserved." *See*, *e.g*., *In re M.B*., 2004-Ohio-5686, at ¶ 15 (9th Dist.); *In re C.M*., 2003-Ohio-5040, ¶ 11 (9th Dist.); *In re Smith*, 2002 WL 5178 (9th Dist. Jan. 2, 2002). This Court has previously reversed permanent custody judgments on appeal because the trial court failed to assign appropriate weight to this critical best interest factor. *See id*.

{¶28} Mother's interaction with the children throughout this case was consistent and positive. She attended visits regularly, even after she moved to West Virginia. By the end of the hearing, the evidence was not disputed that Mother had complied with the case plan and "corrected the concerns that brought this case to the attention of the Court." The guardian ad litem, who had also worked on the prior case with this family, praised Mother for her hard work in this case to resolve her drug problem. She emphasized that Mother had "an excellent relationship with the

boys." The guardian ad litem had also made a trip to West Virginia and opined that the home of Mother and the aunts was appropriate for both children.

{¶29} Next, the trial court was required to consider the wishes of the children and the recommendation of the guardian ad litem. The children, then 14 and almost six years old, had consistently expressed their wishes to be returned to Mother's custody. On the final day of the hearing, the guardian ad litem testified that she was not prepared to make a recommendation about the placement of the children until West Virginia made a final decision on the ICPC. She explicitly stated, "I think we are going to have to wait on that." She further testified that, if West Virginia approved the placement with Mother, she would recommend legal custody to Mother. If West Virginia did not approve Mother for placement, she would alternatively recommend placement with Aunt J. with Mother living elsewhere.

{¶30} The children's custodial history had included two removals from Mother's custody, which had lasted over a total of four years. During those removals, however, Mother had work diligently to remedy her parenting problems. The children needed a legally secure permanent placement, but permanent custody would likely lead to placing the children in separate homes, as CSB had found no placement willing to take both children, except Mother and/or Aunt J.

{¶31} In weighing the totality of the required best interest factors, the trial court recognized that the children wanted to go home, Mother had made great strides in this case, and that Aunt J. "would be a wonderful caregiver for [the children.]" The court emphasized, however, that it did not have authority under the ICPC to place the children with Mother and/or Aunt J. in West Virginia without a final ICPC approval from West Virginia. Although the trial court lacked authority at that time to place the children with Mother or Aunt J., that fact did not shift the balance

of the best interest factors in favor of permanent custody. There simply was not clear and convincing evidence that permanent custody was in the best interest of these children.

{¶32} The trial court appeared to have reached its conclusion that permanent custody was in the best interest of the children, not based on the best interest factors, but because the court believed it had no other choice. The trial court emphasized that it could not wait any longer for the ICPC results because this case had been pending for more than two years. The trial court explicitly recognized that it lacked authority to order another extension of temporary custody. *See* R.C. 2151.415(D)(4) ("the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed[.]"). However, "[t]his Court has consistently held that, based on the plain language of [R.C.] 2151.415(D)(4), a violation of the statutory time limits requires 'an express order by the juvenile court extending or continuing temporary custody[.]'" *In re H.S.*, 2022-Ohio-1478, ¶ 11 (9th Dist.), quoting *In re H.S.*, 2019-Ohio-4334, ¶ 11 (9th Dist.).

{¶33} In this situation, no one was requesting an extension of temporary custody, nor was it necessary for the court to order an extension. The guardian ad litem had explicitly recommended that the court wait for the ICPC results from West Virginia, evidence that was necessary for her to make her recommendation. Because the permanent custody motion was filed before the expiration of the trial court's most recent temporary custody order and before the case had reached the two-year mark, temporary custody continued by operation of law until the court issued a dispositional order on permanent custody motion. *See* R.C. 2151.353(G) (temporary custody continues until pending dispositional motion is resolved); *In re B.D.*, 2023-Ohio-4052, ¶ 23 (9th Dist.) (temporary custody continued by operation of law while permanent custody motion was pending); *In re T.H.*,

2018-Ohio-1143, ¶ 8 (9th Dist.) (temporary custody continued while legal custody motion still pending).

{¶34} Consequently, the trial court was not statutorily required to grant permanent custody after the third hearing date, as it could have scheduled a fourth hearing date to allow the presentation of the ICPC evidence. Although this Court does not encourage delays in resolving permanent custody motions, the specific circumstances of this case warranted the trial court waiting for all the necessary information before it ruled on the permanent custody motion. Typically, this Court reviews evidence from permanent custody hearings about ICPC assessments of potential out-of-state relative placements that were approved or denied, not where the results were still pending. *See*, *e.g*., *In re I.R*., 2023-Ohio-3044, ¶ 10 (9th Dist.); *In re R.R*., 2023-Ohio-2941, ¶ 20 (9th Dist.); *In re L.L.*, 2022-Ohio-4492, ¶ 7-11 (9th Dist.).

{¶35} Consequently, based on the specific facts of this case, this Court cannot affirm the best interest decision in this case. Insofar as the trial court lacked the results of the ICPC priority placement assessment from West Virginia and found that permanent custody was in the best interest of these children based on the evidence before it, Mother's assignments of error are sustained.

### III.

{¶36} Mother's assignments of error are sustained, as explained above. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed and remanded for proceedings consistent with this decision.

Judgment reversed
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

DONNA J. CARR
FOR THE COURT

STEVENSON, P. J.
SUTTON, J.
CONCUR.


APPEARANCES:

ALEXANDRA HULL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.