[Cite as *In re J.M.*, 2022-Ohio-3638.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.M.

C.A. No.     30258

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 19 12 1027

DECISION AND JOURNAL ENTRY

Dated: October 12, 2022

SUTTON, Judge.

{¶1}   Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that awarded legal custody of one of her children to a paternal relative. This Court affirms.

I.

{¶2}   Mother and Father are the biological parents of J.M., born August 4, 2014. The parents, who are married but no longer a couple, are also the parents of two teenaged sons who are not subjects of this appeal but whose circumstances are relevant. All three children had intermittently been in the care of their paternal aunt and uncle ("Aunt" and "Uncle") for three years before Summit County Children Services Board ("CSB" or "the agency") became involved. Aunt is Father's sister, and Uncle is married to Aunt.

{¶3}   Mother and Father have a history of drug use and unstable housing. They sometimes lived in Father's car and sometimes stayed in hotels. In December 2019, Mother and

Father were staying in a hotel with J.M. Father was supposed to be watching J.M. when Mother was in the laundry room, but he stepped outside for a cigarette. Sometime later, the five-year-old J.M. was found alone and crying in the hotel parking lot. After the police were called to the scene, they were eventually able to locate the child's parents. The police arrested Mother on outstanding warrants for two probation violations arising out of underlying criminal convictions, including aggravated possession of drugs. J.M. was returned to Aunt's and Uncle's home where he had been staying with his brothers.

{¶4} CSB filed a complaint in the juvenile court alleging J.M. to be an abused (endangered), neglected, and dependent child.[1] On the same day, the child and his siblings were placed in the emergency temporary custody of Aunt and Uncle under an order of protective supervision by CSB. Mother and Father later attended the shelter care hearing. They waived their rights to a hearing, stipulated to the allegations in the complaints and to a finding of probable cause for removal of the children from the parents' care. The magistrate found that CSB had used reasonable efforts to prevent the children's removals.

{¶5} After an adjudicatory hearing, the juvenile court found J.M. to be an abused, neglected, and dependent child as alleged in the complaint. It also found that, despite the agency's reasonable efforts, the child could not be returned to his parents' care. The parents waived the statutory 24-hour period between adjudication and disposition. Mother waived her right to a dispositional hearing and stipulated to an order of temporary custody to Aunt and Uncle under CSB's protective supervision and to the adoption of the agency's proposed case plan. Evidence presented in Father's absence further supported the temporary custody order and adoption of the

---

[1] The complaint regarding J.M. also indicated that the agency had filed complaints regarding the child's two older brothers and alleging that they also were abused, neglected, and dependent.

case plan. As Mother was in jail, only Father was granted visitation, to be supervised and arranged by agreement of the parties. The juvenile court again found that CSB had used reasonable reunification efforts.

{¶6} Pursuant to the case plan, Mother and Father were required to (1) obtain substance abuse assessments, follow all recommendations, and submit to random drug screens; (2) demonstrate the ability to meet the child's basic needs by maintaining a clean and safe home with working utilities, procuring the financial means to support their household, and making and keeping the child's medical appointments; and (3) participate in parenting education to understand the developmental stages of a child's life and the need for supervision.

{¶7} At the first review hearing, Mother was still incarcerated in a step down facility (Oriana House), and Father was homeless and living in his car. J.M. was doing well in Aunt's and Uncle's care. Around that time, the child's teenaged siblings were returned to Mother's and Father's legal custody, although they were required to remain in Aunt's and Uncle's home until Mother was released from Oriana House and demonstrated a period of sobriety, and the parents had secured appropriate housing.

{¶8} Mother had been released from incarceration by the time of the second review hearing. After that review hearing, the magistrate made various factual findings. Neither parent had obtained housing, although both were employed. Mother had completed her required parenting education, but she had not obtained a substance abuse assessment and refused the agency's August 13, 2020 request for an oral swab. Mother explained that she had been chewing gum and would therefore test positive for alcohol. Father had not participated in parenting education or obtained a substance abuse assessment. The child was doing well in Aunt's and Uncle's home and was maintained in their temporary custody under agency supervision. The

juvenile court again found that, while CSB had continued to use reasonable reunification efforts, J.M. could not safely be returned to his parents' custody.

{¶9} CSB filed a motion for a six-month extension of temporary custody to Aunt and Uncle based on the parents' efforts to address some of their case plan objectives. Based on evidence presented at the sunset hearing, as well as "no objection to granting the motion[,]" the juvenile court granted a first six-month extension of temporary custody to Aunt and Uncle under the protective supervision of CSB. That disposition was maintained after the next review hearing. The juvenile court made the requisite reasonable efforts findings at both hearings.

{¶10} CSB filed a motion for legal custody to Uncle and requested a termination of the agency's protective supervision. By this time, Aunt and Uncle had separated, and Aunt had left the home. The agency alleged that neither parent had stable housing and both had unresolved substance abuse issues. Uncle filed a statement of understanding for legal custody. Father filed a motion for a second six-month extension of temporary custody, although he withdrew that motion immediately prior to the hearing. At the dispositional hearing, Mother orally moved for a second six-month extension of temporary custody. Both CSB and the guardian ad litem opposed Mother's motion as untimely and refused to waive defects in service of the motion.

{¶11} After consideration of the evidence, the magistrate found that it was in the child's best interest to be placed in Uncle's legal custody. Mother filed a timely objection which she supplemented after the transcript of the hearing was filed. CSB filed a brief in opposition.

{¶12} The juvenile court overruled Mother's objections. While finding that Mother's motion for a six-month extension of temporary custody was untimely, the trial court also found that Mother and Father had not demonstrated the requisite additional substantial progress on their case plan objectives to warrant a second extension. The court granted CSB's motion for legal

custody to Uncle and awarded Mother and Father visitation as the parties might arrange. Mother filed a timely appeal and raises two assignments of error for our review. As her assignments of error implicate interrelated issues, this Court consolidates them to facilitate the discussion.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT DENIED MOTHER'S MOTION FOR A SIX-MONTH EXTENSION AND REFUSED TO PROVIDE MOTHER WITH REASONABLE REUNIFICATION EFFORTS.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT GRANTED LEGAL CUSTODY OF J.M. TO UNCLE BECAUSE THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY A PREPONDERANCE OF THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Mother argues that the juvenile court's award of legal custody of J.M. to Uncle was against the manifest weight of the evidence. She argues instead that the evidence supported granting a second six-month extension of temporary custody. Moreover, Mother argues that CSB failed to meet its statutory duty to provide her with reasonable reunification efforts. Mother's arguments are not well taken.

Manifest weight: legal custody

{¶14} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.)

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶15} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's

adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶16} While J.M. was in his parents' legal custody until he was removed at the age of five years, he and his two older brothers had lived on and off in Aunt's and Uncle's home due in part to Mother's and Father's housing instability since J.M. was two years old. The caseworker testified that J.M. loves Mother and Father unconditionally. The child is closely bonded with both parents, his siblings, Aunt, Uncle, and his cousins who reside with him in Uncle's home. Father did not visit with the child very often after an altercation in Uncle's home with two of Uncle's adult children. Mother visited with J.M. three to four times a week until very shortly before the hearing when her visits became less frequent as she was working full time and trying to secure independent housing. While the evidence does not include any specific details regarding Mother's visits with J.M., neither the caseworker, Uncle, nor the guardian ad litem testified as to any impropriety. In fact, the guardian ad litem reported that Mother's interactions with the child were appropriate.

{¶17} J.M. is happy and well adjusted in Uncle's home. Although Uncle and Aunt had separated, Uncle still wanted to provide a home for the child. Uncle has a large home and the financial means to meet the needs of all members of his household, including J.M. Uncle has made appropriate childcare plans for J.M. while Uncle works and the child is not in school. Although Aunt was also willing to provide a home for J.M., she acknowledged that her relocation out of county would complicate matters for the child. Accordingly, Aunt supported Uncle as the child's legal custodian.

{¶18} Uncle testified that he understands his responsibilities should he receive legal custody of the child. He further testified that he understands Mother's and Father's residual rights, including the right to reasonable visitation, and that he is willing to facilitate the parents' visitation under conditions agreeable to them.

{¶19} At the age of seven, J.M. had a limited understanding of the custody issues. The guardian ad litem reported that the child would merely shrug when asked where he wanted to live, although he asserted that he was happy living with Uncle. The guardian ad litem opined that it was in J.M.'s best interest that he be placed in the legal custody of Uncle.

{¶20} Neither parent had demonstrated the ability to provide a permanent home for the child. Although both parents were employed during the 20 months before the hearing, neither had established stable housing. Father continued to live in his car until weeks before the hearing. Mother lived with the maternal grandmother for less than six months before moving in with a maternal aunt. Mother did not disclose to the caseworker where she was living during the month after she vacated the grandmother's home and moved in with her aunt.

{¶21} The caseworker testified that the grandmother's home would have been a suitable physical residence and a viable option for reunification of Mother with J.M. Accordingly, had Mother completed her substance abuse case plan objective, she might have regained legal custody of the child if Mother continued to live in the grandmother's home. Mother argues, however, that CSB forced her to vacate the grandmother's home. She declines to accurately explain the context for her required departure from the grandmother's home.

{¶22} Less than two months after the juvenile court granted a first six-month extension of temporary custody based on Mother's case plan compliance, she refused an oral swab because she was afraid that she would test positive for marijuana. Mother was aware of the agency's policy

that a refusal to submit to drug testing gives rise to a presumption of a positive screen. Two weeks later, Mother submitted to a drug screen which tested positive for methamphetamine and amphetamine. Mother contested the result and provided a list of her medications to the caseworker to pass on to Forensic Fluids so that the laboratory could determine whether any of those medications could produce a false positive. The laboratory confirmed, however, that none of Mother's medications would have resulted in a false positive screen for methamphetamine or amphetamine.

{¶23} After Mother tested positive for drugs, she and the caseworker discussed the possibility of the grandmother becoming the child's legal custodian. The grandmother expressed an interest in pursuing legal custody. The caseworker testified that the agency needed to perform a kinship assessment to determine whether the grandmother would be a suitable candidate for placement or legal custody and that a kinship assessment could not be conducted on any home in which a parent is living. Accordingly, if Mother wanted the grandmother and her home to be assessed, Mother was required to vacate that home. Mother did not leave the grandmother's home, however, until two months before the hearing. By that time, the agency had already conducted a kinship assessment on Uncle, approved his home, and moved for legal custody to him. Accordingly, there was no reason to initiate a kinship assessment of the grandmother at that time. Mother was never ordered by the agency to vacate the grandmother's home. In fact, she remained there months after the caseworker informed her that the agency could not initiate a kinship assessment of the grandmother while Mother was living in that home.

{¶24} Once Mother left the grandmother's home, she failed to disclose her residence to the caseworker until she moved in with an aunt a month later. While the aunt's home would have been suitable for Mother and the child, Mother indicated that she did not plan to stay there, but

instead was seeking her own apartment across the street. The caseworker testified that that home likely would have been appropriate for the child. However, because Mother had not remained in any particular home for at least six months, the caseworker testified that Mother had not demonstrated the necessary housing stability to fully comply with her basic needs case plan objective.

{¶25} The caseworker further testified that Mother had not complied with her substance abuse case plan objective and that Mother's drug use remained an ongoing concern. Mother argues that she participated in substance abuse services while she was incarcerated at Oriana House early in the case and that there were no recommendations for further services after her release. The evidence indicates, however, that the Covid-19 pandemic resulted in the furlough of counselors and Mother's early release from Oriana House without a clear understanding of whether Mother required ongoing drug treatment or other services.

{¶26} Mother was required to submit to random drug screens. She refused to submit to any screens during a four-month period early in the case, including once when she asserted that her chewing gum would indicate a false positive for alcohol use; she refused a later request during the first extension of temporary custody after she admitted using marijuana; and she tested positive two weeks later for methamphetamine and amphetamine. At that time, the caseworker declined to ask Mother to submit to additional drug screens and instead referred her for a current substance abuse assessment pursuant to agency policy.

{¶27} The caseworker explained that a positive drug screen demonstrates a relapse. Therefore, CSB requires a new assessment to help both the agency and the parent understand the reason for the relapse and to determine what treatment and services would best help the parent

reattain sobriety. Accordingly, the new assessment serves as a tool that both the agency and the parent can utilize in an effort to facilitate reunification.

{¶28} In the six months after Mother tested positive for drugs, she failed to submit to an assessment despite the caseworker's encouragement and referral to Community Health Center. While Mother informed the caseworker that she had obtained a substance abuse assessment a few days before the hearing, she could not identify the agency that performed the assessment and the caseworker had no verification that an assessment had been completed. Given Mother's failure to address her substance abuse case plan objective, drug use remained an ongoing concern regarding Mother's ability to provide a safe and stable permanent home for J.M.

{¶29} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by awarding legal custody of J.M. to Uncle. The preponderance of the evidence established that Uncle was willing and able to provide a safe and stable home for the child, as he had for almost two years during the case. Uncle also demonstrated his commitment to facilitating visitation between the parents and the child.

{¶30} Despite their love for the child, neither Mother nor Father was in a position to provide timely permanence for J.M. Neither parent had resolved their issues with unstable housing. Father only obtained housing shortly before the hearing, while Mother was in the process of trying to secure an apartment at that time. Father failed to obtain a substance abuse assessment or provide any oral drugs swabs throughout the case. Mother initially participated in substance abuse services at Oriana House and was making good progress on her case plan objectives. After a first six-month extension of temporary custody was granted, however, Mother relapsed into drug use and refused to obtain a current substance abuse assessment to address her lapse from sobriety.

{¶31} J.M. is happy and comfortable in Uncle's home where he lives with at least one of his brothers. The guardian ad litem recommended legal custody to Uncle as being in the child's best interest. Under the circumstances, the juvenile court's award of legal custody of J.M. to Uncle is not against the manifest weight of the evidence.

Six-month extension of temporary custody

{¶32} Mother further argues that the juvenile court erred by not granting a second six-month extension of temporary custody to allow her additional time to continue to work on her case plan objectives. As previously stated, the juvenile court must resolve a motion for legal custody solely in consideration of the best interest of the child. *In re K.H.*, 2016-Ohio-1330, at ¶ 12. It is well settled that "'[w]here the trial court finds that it is in the best interest of a child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny any extension of temporary custody.'" *In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 22, quoting *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 24.

{¶33} Moreover, before the juvenile court may grant a second six-month extension of temporary custody, it must find, among other things, that clear and convincing evidence demonstrates that "there has been substantial additional progress" on the case plan and in furtherance of reunification since the court granted the first extension of temporary custody. R.C. 2151.415(D)(2). As explained above, Mother made no additional progress on her case plan objectives since the juvenile court granted a first six-month extension. In fact, Mother made no progress in securing stable housing, she relapsed into drug use, and she failed to obtain a current substance abuse assessment to address the reasons behind her return to drug use and to determine which treatment services might help her regain sustained sobriety. Accordingly, the juvenile

court's denial of Mother's request for a second six-month extension of temporary custody is not against the manifest weight of the evidence.[2]

<u>Reasonable efforts</u>

{¶34} Finally, Mother argues that CSB failed to use reasonable efforts to help her achieve reunification with J.M. Her argument is not well taken.

{¶35} Pursuant to R.C. 2151.419(A)(1), a child welfare agency must use "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." In addition, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." *Id*. Because R.C. Chapter 2151 does not define "reasonable efforts," courts have construed that term to mean "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed[.]'" *In re T.B.-W.*, 9th Dist. Summit No. 27544, 2015-Ohio-992, ¶ 15, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 21.

{¶36} "The case plan is the tool used by the agency to facilitate family reunification efforts." *In re K.J.*, 9th Dist. Summit No. 29915, 2021-Ohio-4413, ¶ 18, citing *In re H.S.*, 9th Dist.

---

[2] Although the juvenile court agreed with the assistant prosecutor and the guardian ad litem that Mother's request for an extension of temporary custody was untimely, the court nevertheless addressed the request on the merits. Accordingly, this Court has addressed Mother's substantive challenge to the juvenile court's denial.

Summit Nos. 28944 and 28948, 2018-Ohio-3360, ¶ 18. Indeed, "the overriding purpose of the case plan is to allow the agency to assist the parents in remedying the conditions underlying a child's removal so that the child can be returned safely to one or both parents' custody." *In re K.J.* at ¶ 18, citing *In re S.R.*, 9th Dist. Summit No. 27209, 2014-Ohio-2749, ¶ 45.

{¶37} CSB developed a case plan with multiple objectives for Mother who agreed with those objectives and stipulated to the juvenile court's adoption of the case plan. In addition, the juvenile court consistently found that the agency had used the statutorily required reasonable efforts, and Mother never challenged any of those findings below. Therefore, Mother has forfeited the issue on appeal. *See In re G.M.*, 9th Dist. Wayne Nos. 14AP0040 and 14AP0041, 2015-Ohio-582, ¶ 26. Nevertheless, an appellant may still assert a claim of plain error despite having otherwise forfeited the issue. *Id.* at ¶ 27.

{¶38} Plain error requires not only trial court error, but also prejudice as a result of that error. *In re T.G.*, 9th Dist. Summit No. 29658, 2020-Ohio-4802, ¶ 22. Although Mother mentions "plain error" in her assignments of error, she has not set forth any argument in that regard. Specifically, she has not set forth the requisite standard of review or explained how the juvenile court's findings resulted in prejudice. On the other hand, Mother expressly identifies the case plan objectives CSB created to facilitate parent-child reunification, implicitly recognizing the agency's reasonable efforts.

{¶39} Mother's specific arguments regarding CSB's alleged lack of reasonable efforts are not well developed, although she notes two factual bases. She argues that CSB effectively evicted her from the stable home she had at the grandmother's residence and that the caseworker would not allow her to submit to additional drug screens after she tested positive for methamphetamine. This Court has already discussed the evidence which supports the agency's justification for its

approaches under these circumstances. Mother has not demonstrated any error by the juvenile court in determining that CSB had made the statutorily mandated reasonable efforts in this case. Mother's assignments of error are overruled.

### III.

{¶40} Mother's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

HENSAL, P. J.
CARR, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

JAYSEN W. MERCER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

BENJAMIN AYERS, Guardian ad Litem.