[Cite as *In re L.D.*, 2023-Ohio-4052.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: B.D.
    L.D.

C.A. Nos.    30705
               30706
               30742
               30743

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 21 03 0179
                DN 21 03 0180

DECISION AND JOURNAL ENTRY

Dated: November 8, 2023

---

CARR, Presiding Judge.

{¶1}    Appellants, H.D. ("Mother") and L.D. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed their two minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2}    Mother and Father have been married for many years and are the biological parents of L.D., born February 27, 2011; and B.D., born May 27, 2016. The family has a lengthy history with CSB, including one prior case in which L.D. was adjudicated neglected and dependent; and later cases in which L.D. was adjudicated abused, neglected, and dependent, and B.D. was

adjudicated abused and dependent. Only cursory details about CSB's prior cases with this family are included in the record.

{¶3} The record does reveal that the parents have historically had problems maintaining a safe and sanitary home and meeting their children's significant medical and developmental needs. Both children have been diagnosed with Sox2 anophthalmia syndrome, a rare genetic disorder that causes developmental delays and abnormal development of the eyes and other parts of the body. The disorder will impair the children throughout their lives and require ongoing treatment by various medical specialists and developmental therapists. Additionally, B.D. has been diagnosed with epilepsy, which requires ongoing treatment by a neurologist and that his caregivers regularly administer and monitor his seizure medication and symptoms. Both children have also been diagnosed with multiple mental health disorders and will require ongoing counseling for the foreseeable future to address their mental health and resulting behavioral problems. Throughout the children's lives, however, the parents have not been consistent in getting them to their required appointments.

{¶4} Mother has numerous mental health diagnoses, including major depressive disorder, generalized anxiety disorder, and borderline personality disorder, which impair her ability to care for herself and her children. Mother has a pattern of engaging in mental health treatment for a while, but later withdrawing from treatment and becoming unable to care for herself or her children. While not engaged in mental health treatment, Mother would admittedly stay in bed for days or weeks at a time. She also suffers from significant knee, hip, and ankle problems that limit her mobility and ability to care for her two active children. Mother has not followed up with consistent medical treatment to address her physical problems. Father has attempted to help care for Mother and the children but has been unable to consistently meet their needs.

{¶5} The parents also have a history of struggling to meet their financial needs. Neither parent has been employed throughout CSB's involvement with this family. The family's only sources of income were the disability benefits received by Mother and both children. In addition to their limited financial means, the parents often spent their money unwisely. For example, Father is a collector of movie memorabilia and sometimes spent a significant portion of their limited financial resources to build his collection, rather than paying for necessities including the family's monthly rent.

{¶6} This family's first juvenile case predated the birth of B.D. L.D. was removed from the parents' custody for approximately one year, and the court later returned him to their home and closed the case. During the children's 2018 cases, it is unclear from the record whether only L.D. or both children were removed from their home, but the family worked on another case plan and those cases were eventually closed with both children in their parents' custody.

{¶7} During December 2019, CSB again began working with the family on a voluntary basis because the home was filthy, Mother was sleeping most of the day, and neither parent was regularly getting the children to school or their frequent appointments with their medical and developmental specialists. After more than one year working on a voluntary case plan, the home continued to be filthy and filled with bugs and animal feces, the children continued to miss crucial medical and therapy appointments, and Mother was not addressing her mental or physical health problems. Service providers worked with the parents to develop a reasonable budget, but the family continued to struggle financially.

{¶8} The children were removed from the home pursuant to Juv.R. 6 and CSB filed complaints to commence this case on March 17, 2021, alleging that both children were neglected and dependent. After the parties agreed that CSB would dismiss the allegations of neglect and the

parents would waive their rights to a contested hearing, the trial court adjudicated L.D. and B.D. as dependent children. The trial court later placed the children in the temporary custody of CSB. In its dispositional order, although the trial court referred to the case plan that CSB filed and began implementing, the trial court did not explicitly adopt the case plan as an order of the court. Nevertheless, no one raised this omission during the trial court proceedings and all parties proceeded as if they were bound by the case plan that CSB had filed.

{¶9} During the first year of the case, both parents worked on the reunification goals intermittently. Upon CSB's motion, the trial court granted a first six-month extension of temporary custody. During the extension period, however, Father stopped cooperating with CSB to work toward reunification. Mother changed mental health providers multiple times, sometimes by choice and sometimes because the provider terminated her for missing too many appointments. They also missed many scheduled visits with the children. Mother told the caseworker that transportation was sometimes a problem, or they overslept, or simply forgot about scheduled visits or appointments.

{¶10} The parents also failed to maintain clean and safe housing or demonstrate that they could meet the family's basic needs. Although Father had received a $7,000 inheritance, he spent that financial windfall on movie memorabilia, including a hearse that he planned to convert into a Ghostbuster's vehicle. The parents had no other vehicle at that time and owed a substantial balance to their landlord for several months of unpaid rent.

{¶11} CSB eventually moved for permanent custody of both children. Mother and Father moved for legal custody or, alternatively, for a second six-month extension of temporary custody. The final dispositional hearing was held before a visiting judge on February 16 and 17, and March 31, 2023. After the hearing concluded, the trial court terminated parental rights and placed L.D.

and B.D. in the permanent custody of CSB. Mother and Father separately appealed and their appeals were later consolidated for review. Mother raises three assignments of error and Father raises two.

II.

**MOTHER'S ASSIGNMENT OF ERROR I**

THE COURT COMMITTED PLAIN, REVERSIBLE ERROR TO THE PREJUDICE OF THE MOTHER WHEN IT FAILED TO JOURNALIZE ANY CASE PLAN AT THE ORIGINAL DISPOSITIONAL HEARING, THUS DEPRIVING HER OF COURT ORDERS TO FACILITATE STATUTORILY MANDATED REUNIFICATION EFFORTS.

{¶12} Mother's first assignment of error is that the trial court erred by failing to journalize a case plan in the initial dispositional decision. *See* R.C. 2151.353(E) and 2151.412(E) (both requiring the trial court to journalize a case plan in its initial dispositional order after adjudication). A review of the record reveals that, although the trial court emphasized in its dispositional order that CSB had developed and begun implementing a case plan in each child's dependency case, it did not actually adopt or journalize the case plan as a court order.

{¶13} During the trial court proceedings, however, Mother did not bring this error to the attention of the trial court, nor did any other party. Had Mother raised a timely objection, the trial court would have had the opportunity to promptly remedy its error by journalizing the case plan. *In re S.C.*, 9th Dist. Summit No. 27676, 2015-Ohio-2623, ¶ 11. Throughout this two-year case, neither parent raised this error at any time before or during the permanent custody hearing. Consequently, Mother has waived all but plain error. *Id.* Although Mother includes the term "plain error" in her stated assignment of error, she has not developed a plain error argument. *See In re J.M.*, 9th Dist. Summit No. 30258, 2022-Ohio-3638, ¶ 38. In fact, she has not argued or demonstrated that the trial court's failure to adopt the case plan caused her to suffer any prejudice.

The record demonstrates that CSB provided Mother with all the reunification services that were set forth in the case plan.

{¶14} According to the record before this Court, the parties and the trial court were under the apparent impression that the trial court had adopted the original and amended case plans. *See In re S.C.*, 2015-Ohio-2623, at ¶ 24-26. Both parents participated in the first semi-annual review ("SAR") of the case plan in August 2021. Of relevance to Mother's reunification services, the SAR form indicates that CSB had connected her with a counseling provider and another service provider for parenting classes. Although Mother had missed some appointments, she was engaging in those services. Mother informed the caseworker that she valued her counseling sessions and was taking her psychiatric medications as prescribed. At that time, the parents had lost their housing and were living in a hotel. CSB was working with them to secure other housing that would be suitable for the children. CSB also indicated that both parents had been cooperative with the agency and were working to resolve their parenting problems.

{¶15} After a review hearing in January 2022, the magistrate journalized more details about CSB's reunification efforts and the parents' compliance with the goals of the case plan. The magistrate explained that Father had "significantly improved his interactions" with L.D. and that Mother had switched to a different agency for mental health treatment. At the next SAR of the case plan, CSB noted the progress that the children were making through their involvement in case plan services and explained the progress made by the parents, in their attempts to comply with the reunification goals of the case plan. CSB later moved for, and was granted, a first six-month extension of temporary custody "to allow for further case plan progress and for the parents to demonstrate they are able to meet the children's needs."

{¶16} During the following months, however, the parents made only sporadic progress on their reunification goals, but CSB continued to work with them toward reunification. At the permanent custody hearing, all parties questioned witnesses about the parents' compliance with specific goals of the case plan and the agency's efforts to help them meet those goals. Each parent testified about their attempts to comply with the case plan and/or offered explanations for why they had not fully complied with the case plan. There was no evidence before the court to suggest that anyone believed that the case plan was not binding.

{¶17} A thorough review of the record reveals that all parties proceeded through this two-year case as if they were bound by the requirements of CSB's original and amended case plans. Because Mother does not argue, nor does the record demonstrate, that the trial court's failure to journalize the case plan resulted in any prejudice to the parties, Mother's first assignment of error is overruled.

## MOTHER'S ASSIGNMENT OF ERROR II

THE COURT COMMITTED PLAIN, REVERSIBLE [ERROR] TO THE PREJUDICE OF MOTHER WHEN IT REFUSED HER REQUEST TO MODIFY THE COURT'S ORDER OF TEMPORARY CUSTODY AS PERMITTED BY R.C. §2151.415(F)(2).

## FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT MISSTATED THE LAW THAT PARENTS ARE NOT PERMITTED TO FILE FOR A SECOND SIX-MONTH EXTENSION.

{¶18} This Court will address the parents' second assignments of error together because they allege the same error. They contend that the trial court erred by denying their request for a second six-month extension of temporary custody because the trial court erroneously found that the parents lacked standing to request the extension under R.C. 2151.415(D)(2).

{¶19}  During a discussion at the hearing, the visiting trial judge questioned whether either parent had standing to request an extension of temporary custody because the statute refers only to the agency making a request for a second extension of temporary custody.  *See* R.C. 2151.415(D)(2).  The visiting trial judge, who had apparently presided over juvenile courts outside this appellate district, noted that the law in another appellate district is that only the agency has standing to request an extension of temporary custody.  The judge ultimately concluded that the parents lacked standing to request an extension.

{¶20}  Both parents argue that the judge's conclusion on the standing issue is erroneous and, therefore, the denial of their request for an extension of temporary custody must be reversed.  Although the trial judge initially stated that the parents lacked standing to request an extension of temporary custody, by the time the hearing concluded and the court issued its final judgment, the trial court explicitly concluded that the standing issue had become moot because it lacked statutory authority to order another extension of temporary custody due to time constraints.

{¶21}  R.C. 2151.415(D)(4) and R.C. 2151.353(G) provide that the juvenile court "shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier[.]"  CSB filed the complaints pertaining to L.D. and B.D. on March 17, 2021, and the hearing concluded on March 31, 2023, more than two years later.  Consequently, even if the trial court incorrectly reasoned that the parents lacked standing to request an extension of temporary custody, any error in that reasoning was harmless.  The parents' second assignments of error are overruled.

### MOTHER'S ASSIGNMENT OF ERROR III

THE COURT COMMITTED PLAIN ERROR WHEN IT VIOLATED R.C. §2151.[4]15(D)(4) AND CONTINUED THE ORDER OF TEMPORARY CUSTODY TO [CSB] PAST MARCH 17TH, 2023, WHEN THE COURT LOST THE STATUTORY AUTHORITY TO CONTINUE SUCH AN ORDER.

{¶22} Mother's final assignment of error is that the trial court violated R.C. 2151.415(D)(4) by continuing the order of temporary custody beyond the two-year sunset date of March 17, 2023. As quoted above, R.C. 2151.415(D)(4) provides that the juvenile court "shall not *order* an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier[.]" (Emphasis added.) In this case, the trial court did not issue an "order" that temporary custody would continue beyond March 17, 2023. The last temporary custody "order" issued in this case was on March 8, 2022, when the trial court granted CSB's request and ordered that temporary custody continue for another six months. That order, on its face, would appear to expire in September 2022, long before the two-year sunset date.

{¶23} Instead, the March 8 temporary custody order continued pursuant to the explicit terms of R.C. 2151.353(G). That statute provides that "upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section." Before the expiration of the first six-month extension of temporary custody, CSB filed its motion for permanent custody pursuant to R.C. 2151.415(A)(4). Consequently, temporary custody to CSB continued by operation of law, not by an order of the trial court, until the trial court ruled on the pending motion for permanent custody. *See In re T.H.*, 9th Dist. No. Summit No. 28833, 2018-Ohio-1143, ¶ 8. Because Mother has failed to demonstrate that the trial court violated R.C. 2151.415(D)(4) or lost statutory authority to rule on the permanent custody motion beyond the two-year sunset date, her third assignment of error is overruled.

<u>**FATHER'S ASSIGNMENT OF ERROR I**</u>

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN
AND REVERSIBLE ERROR WHEN IT GRANTED PERMANENT CUSTODY

TO [CSB] AND DENIED FATHER'S MOTION FOR RETURN OF CUSTODY AS THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

**{¶24}** Father's final assignment of error is that the trial court erred in placing the children in the permanent custody of CSB rather than in his legal custody. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶25}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶26} The trial court found that the first prong of the permanent custody test was satisfied in this case for two alternative reasons: L.D. and B.D. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period; and L.D. had been adjudicated abused, neglected, and/or dependent three times. R.C. 2151.414(B)(1)(d) and (e). Father does not challenge either finding on appeal, and both findings are fully supported by the record.

{¶27} Father asserts that it was in his children's best interest to be returned to his legal custody, rather than to be placed in the permanent custody of CSB. This Court has repeatedly emphasized "that if permanent custody is in the best interest of the child, legal custody to a relative necessarily is not." *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 26. Consequently, this Court will review the trial court's decision that permanent custody was in the best interest of the children. This Court's best interest review focuses on the best interest factors set forth in R.C. 2151.414(D). In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.[1] R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶28} The interaction between Father and the children was limited to supervised or monitored visits throughout this case. Father missed many visits with the children and, when he did visit, the visits were chaotic. Mother and Father usually came together and could not control

---

[1] The trial court did not find that any of those provisions applied to the facts of this case.

the children's outbursts because they usually disagreed about how to redirect the children's misbehavior.

{¶29} Several witnesses testified that Father did not appear to be bonded to either child, especially L.D. Father admitted that his relationship with L.D. was not close. He testified at the hearing that, after L.D. was removed from the parents' custody in the first case several years ago, he emotionally distanced himself from the child because he was afraid of being hurt again. Father admitted that, at the time, he did not realize that he was placing his own needs ahead of those of his child or that, by avoiding a close relationship with L.D., he had caused emotional damage to the child. Father further testified that, through marriage counseling over the past 5 years, he had begun to realize the mistakes he had made in his relationships with Mother and the children and was "still working" on repairing those relationships.

{¶30} Mother and Father planned to remain married and continue living together. When anyone expressed concern that Mother's limited mobility and mental health issues affected her ability to help care for the children, both parents would respond that Father will provide most of the hands-on care for the children. In addition to concerns that Father tended to spend more time caring for Mother than the children, the parents admitted that they have different parenting styles and often fought about how to parent their children. Mother testified that, through marriage counseling, she and Father were "working towards" learning how to parent the children as a team. She admitted that they still needed to improve their communication with each other to get "on the same page" about how to parent the children. The testimony of both Mother and Father implied that they needed more time to learn how to jointly care for their children, not that Father was prepared to take legal custody of the children.

**{¶31}** The interaction between the two siblings, on the other hand, was positive. They are closely bonded and L.D. can communicate with B.D., who is nonverbal and communicates only through gestures. Both children are placed together in the same foster home, where all their needs are being met. The foster mother is bonded with both children and ensures that they attend all their required appointments and reinforces the techniques that they learn in therapy. The foster mother may consider adopting both children but, because she planned to get married soon, she was waiting for input from her future husband, who was then living in another country.

**{¶32}** The children's wishes were expressed through their appointed counsel and the guardian ad litem. Although Father argues on appeal that both children had expressed their wishes to return to his custody, the record does not support his argument. Separate counsel had been appointed to represent the children several months earlier because they had expressed a desire to return home to live with Mother. By the time of the hearing, however, several witnesses testified that neither child was bonded with Father and that L.D. had repeatedly expressed that he did not like Father and did not want to spend time with him. B.D. was nonverbal and the guardian ad litem testified that he had been unable to ascertain his wishes.

**{¶33}** The guardian ad litem opined that permanent custody was in the best interest of both children because the parents were unable to meet the basic or significant medical, developmental, or emotional needs of these children, as demonstrated through three cases with CSB. He emphasized that Mother could not take care of herself, let alone two high-needs children, and that Father has failed to demonstrate that he could take care of the needs of his family.

**{¶34}** The custodial history of the children has included more than two years living in the temporary custody of CSB during this case. L.D. had spent another year living outside their custody in the agency's first case with this family. It is unclear whether both children were also

removed from their parents' custody during the 2018 case. What is clear from the record is that these children have significant physical, mental health, and developmental needs, and, when they did live in the custody of Mother and Father, the parents did not adequately meet those needs, or even the children's basic needs for a safe and stable home.

{¶35} When reviewing the children's custodial histories, this Court has emphasized that it must consider not only the time period itself but also the reasons for the children's placements outside their parents' custody and the implications that those placements had on the children. *In re A.P.*, 9th Dist. Summit No. 30056, 2022-Ohio-276, ¶ 12. CSB had repeatedly opened new cases with this family and has worked with the parents on multiple case plans over a period of several years. Nevertheless, the parents continued to struggle with the same parenting problems that have plagued this family for many years. These children, particularly L.D., have repeatedly been left in a state of custodial limbo. The fact that all the children's medical, emotional, and developmental needs were met during periods outside their parents' custody, while the parents failed to resolve their parenting problems, tilts the custodial history factor in favor of permanent custody. *See id.*

{¶36} During the voluntary case in 2019, the parents failed to consistently get the children to their scheduled medical and therapy appointments. They also missed 9 or 10 months of appointments for B.D. with the child's pediatric neurologist and failed to follow through with additional testing and treatment that the neurologist had recommended. The neurologist testified that Father did not seem to understand the significance of the child's epilepsy diagnosis. He explained that B.D.'s epilepsy could result in his death if the child's seizures and medication are not carefully monitored by a medical provider and his caregiver.

{¶37} Another witness, who had worked on parenting instruction with Father, testified that Father did not understand his children's developmental delays and had unrealistic expectations

about what each child could do. That witness further testified that the home continued to pose a safety hazard to the children, as it was excessively cluttered and filled with filthy items as well as cockroaches and rodent feces. The witness worked with the family for more than one year, yet she saw no improvement in the safety or cleanliness of the home. That witness further testified that, due to Mother's poor physical and mental health, Father spent most of his time caring for her and not the children.

{¶38} These children have significant needs, which have not been met by their parents. CSB has opened three cases with this family and, many years later, the parents still have not demonstrated that they can provide the children with a safe and stable home and/or consistently meet their needs. These children need stability and CSB had been unable to find any relatives who were willing to provide them with a suitable permanent home. The children had developed stability in their current foster home. Although the foster mother was still uncertain about whether she wanted to adopt the children, CSB planned to place the children together. The trial court reasonably concluded that a legally secure permanent placement would be achieved by placing the children in the permanent custody of CSB with a goal of adoption.

{¶39} Father has failed to demonstrate that the trial court lost its way by concluding that permanent custody was in the best interest of L.D. and B.D. *See Eastley* at ¶ 20. Father's first assignment of error is overruled.

### III.

{¶40} The parents' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants equally.

DONNA J. CARR
FOR THE COURT

STEVENSON, J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

JASON WALLACE, Attorney at Law, for Appellant.

ALEXANDRA HULL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and MARRETT W. HANNA, Assistant Prosecuting Attorney, for Appellee.

NOWAR KATIRJI, Guardian ad Litem.